**INTERSTATE TOWING ASSOCIATION, INC., Plaintiff–Appellant,**

v.

**CITY OF CINCINNATI, OHIO, Defendant–Appellee.**

No. 92–3731.

United States Court of Appeals, Sixth Circuit.

Argued June 15, 1993.

Decided Oct. 13, 1993.

Brett Colbert Goodson (briefed), Kimpel, Hyland, Weinkam & Goodson, Cincinnati, OH, Michael P. McGovern (argued and briefed), McGehee & Newton, Knoxville, TN, for plaintiff-appellant.

James F. McCarthy, III (argued and briefed), Fay D. Dupuis, City Solicitor's Office, Cincinnati, OH, for defendant-appellee.

Before: GUY and BATCHELDER, Circuit Judges; and MILES, Senior District Judge.[*]

BATCHELDER, Circuit Judge.

By ordinance, the City of Cincinnati, Ohio ("City") requires all tow trucks that tow vehicles from locations within City limits to other City locations, or to locations outside the City, to be licensed by the City. Cincinnati, Ohio, Mun.Code § 869–7 (1990).[1] The ordinance applies to all towing companies or operators based within the City limits or within a 25–mile radius of the City limits. *Id.* To obtain a license, proof of which is evidenced by an emblem known as a "T-sticker" placed on the windshield of each tow truck, *id.* §§ 869–17, –19, the towing opera-

tor must fill out an application form, *id.* §§ 869–9, –11; show proof of general liability insurance in the amount of at least $300,000, *id.* § 869–13(a), and of "garage keeper's liability" insurance of at least $50,000, *id.* § 869–13(b); post a $5,000 bond, *id.* § 869–15; submit each wrecker for City inspection, *id.* § 869–9; and pay an $80 fee, *id.* The City assesses fines for performing towing services without the requisite license. *Id.* § 869–99. Towing services must be rendered in compliance with regulations set out by the City. *Id.* § 869–21.

Plaintiff-appellant Interstate Towing Association ("ITA") represents the interests of towing concerns nationally, including concerns located in and around Cincinnati. In October 1990, plaintiffs[2] filed suit against the City, seeking a preliminary injunction against enforcement of this ordinance and challenging the validity of the ordinance, arguing that federal interstate trucking laws preempt the ordinance, that the ordinance impermissibly burdens interstate commerce, and that it fails muster under the United States Constitution. The district court consolidated the preliminary injunction motion and the underlying suit for bench trial.

The district court found in favor of the City, holding that the ordinance is not preempted by federal law, is not excessively burdensome on interstate commerce under the Commerce Clause, and is not violative of the Fourteenth Amendment, being reasonably related to legitimate municipal interests. *See Interstate Towing v. City of Cincinnati,*

---

[*] The Honorable Wendell A. Miles, Senior United States District Judge for the Western District of Michigan, sitting by designation.

1. This section of the ordinance reads:

   No wrecker or towing operator shall engage in the business of offering towing services by use of a wrecker or similar vehicle by removing parked or disabled motor vehicles from any street, or property, whether public or private, located in the city of Cincinnati, unless a license is obtained from the city treasurer for each place of business operated by the wrecker or towing operator. This includes those operators both within and without the corporate limits of the city of Cincinnati.

   No licensee shall operate a wrecker or automobile used for towing purposes to remove parked or disabled motor vehicles from any street, or property, whether public or private,

   located in the city of Cincinnati and towing them over the streets of Cincinnati, unless a license sticker is obtained from the city treasurer for such wrecker or automobile.

   The requirements of this section shall not apply (1) to wrecker or towing operator(s) whose place(s) of business is (are) located more than 25 miles from the city limits of the city of Cincinnati and who are subject to and have complied with the safety regulations of the U.S. Department of Transportation (49 CFR Parts 390–399); or (2) to any wrecker or operator who uses his wrecker exclusively for towing, winching, or moving his own property. Cincinnati, Ohio, Mun.Code § 869–7 (1990).

2. Several parties not before us on appeal were plaintiffs in the district court action: Towing and Recovery Association of Kentucky, Tri–State Towing Association, and Al's Towing.

799 F.Supp. 805 (S.D.Ohio 1992). For the reasons we discuss presently, we agree.

## I.

### A.

■■■ ITA contends that federal law impliedly preempts[3] the ordinance. The Constitution declares that "the Laws of the United States ... shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Among other circumstances, federal law preempts state law "when there is an outright or actual conflict between federal and state law." *Louisiana Public Serv. Comm'n v. FCC*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). Regulations promulgated by a federal agency that conflict with state law preempt state law in the same manner as do specific acts of Congress. *Id.* at 369, 106 S.Ct. at 1898–99. The courts presume that federal legislative or regulatory action intends to preempt parallel state and local legislation. *Id.*

First, ITA notes that federal regulations require its trucks, like all interstate trucks over 10,000 lbs. gross weight, to undergo extensive mechanical inspections; the City, on the other hand, requires only a minimal inspection conducted by "untrained and unskilled police officers." ITA presented evidence at trial that the City inspections were perfunctory at best, taking only a few minutes, and that certain of the required tests, for example, the brake safety regulation requiring inspectors to test whether the truck going 20 miles per hour can stop within 30 feet, were not actually done on a regular basis. ITA also presented testimony describing the federal roadside inspection as thorough and lengthy compared to the City tow truck inspections. One of plaintiffs' witnesses said that he took a wrecker to be inspected by the City, it passed inspection, and then he took the same wrecker within a short time to the federal inspection station, where it was deemed "unroadworthy" due to numerous mechanical problems.

The district court found that while both the federal trucking regulations and the City ordinance require inspections, the inspections are "not identical." *Interstate Towing*, 799 F.Supp. at 809. We agree. Federal regulations impose a galaxy of equipment requirements on interstate trucks, including specifications for lights, electrical systems, brakes, windows, fuel systems, tires, emergency equipment, and a number of miscellaneous items. *See* 49 C.F.R. Ch. III, Subchapter B, Part 393. Trucks must be inspected at least once annually, 49 C.F.R. § 396.17, inspectors must meet minimum qualifications, 49 C.F.R. § 396, and several pages of regulations dictate what defects result in failure of a vehicle to pass federal inspection, 49 C.F.R. Ch. III, Appendix G to Subchapter B. The City, too, requires an annual inspection, which, as the City regulations indicate, encompasses far fewer items.

Perhaps surprisingly, the two inspection schemes overlap only slightly. Most importantly, while the federal regulations encompass all interstate trucks, and generally focus on tractor-trailer type vehicles, the City ordinance specifically addresses the safety requirements of tow trucks. As the City argued before the district court, its primary goal in implementing the ordinance was to ensure safe, standardized, high-quality towing service; the regulations reflect that goal. Most of the City regulations, therefore, specify the minimum equipment required for each tow truck. Depending on the size and category of the truck, certain winch capacities are required. The regulations require each wrecker to carry accessories such as tow bars, chains, a fire extinguisher, brooms, a shovel, "and other equipment necessary to render first class towing service." Cincinna-

---

**3.** While ITA first claims that federal law "expressly" preempts the Cincinnati towing ordinance, their argument that "[t]he clear language of the federal statute evidences an intent on the part of Congress to preempt local [laws]," ITA's Brief at 14, may properly be understood as one for "implied" preemption. Express preemption occurs only where the federal statute itself explicitly states that certain state and local laws shall be preempted. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95–96, 103 S.Ct. 2890, 2898–99, 77 L.Ed.2d 490 (1983); *Michigan Consol. Gas Co. v. Panhandle E. Pipe Line Co.*, 887 F.2d 1295, 1300 (6th Cir.1989), *cert. denied*, 494 U.S. 1079, 110 S.Ct. 1806, 108 L.Ed.2d 937 (1990). The Motor Carrier Safety Act of 1984; the statute on which ITA relies most heavily, contains no such language.

ti, Ohio, Wrecker and Towing Rules and Regulations (City Regulations) § C(a)–(e).

■ The only areas where the City Regulations arguably overlap with federal regulations is in the City's requiring wreckers to be equipped with "Class A" turn signals, City Regulations § C(d), and with sufficient brakes to meet standards set out under the Ohio Code and another City ordinance. The inspection, however, requires only that the truck be able to stop from 20 miles per hour within 30 feet, for trucks over 10,000 pounds gross vehicle weight (GVW) such as the plaintiffs', actually a more stringent requirement than that promulgated under federal regulations. *See* 49 C.F.R. § 393.52(d), Table B (requiring vehicles over 10,000 lbs. GVW to be able to stop from 20 m.p.h. within 35 feet). Since the City ordinance requires additional equipment specific to tow trucks not required under federal regulations, and since the City imposes at least the same if not more stringent requirements than do the federal regulations in the areas of overlap (brakes and turn signals), the City ordinance is not preempted by the Motor Carrier Safety Regulations, 49 C.F.R. §§ 350–399. While ITA has presented evidence that the City may be less than diligent in its enforcement of its own regulations, that evidence has ultimately no relevance to the question of specific preemption, which requires us to look only at the potentially conflicting laws and regulations as promulgated.[4]

### B.

■ Next, ITA asserts the doctrine of "field preemption," arguing that in the area of interstate trucking, "Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law." *Louisiana Public Serv. Comm'n,* 476 U.S. at 369,

106 S.Ct. at 1898. Citing the Act's legislative history, ITA posits that the MCSA came about in an effort to establish standard trucking laws and regulations for the nation and thus largely eliminate state and local efforts to regulate trucking, which had unduly hampered the free interstate movement of trucks. The Act includes provisions requiring all states and subdivisions thereof to submit extant or planned trucking regulations to the Secretary of Transportation (Secretary) for approval. In the absence of such approval, Congress intended to preempt all state and local regulations on interstate trucking that are less stringent than the applicable federal regulations.

ITA would have us apply the recent case of *Gade v. National Solid Wastes Management Ass'n,* —— U.S. ——, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992), to the question of whether the MCSA preempts the ordinance. In *National Solid Wastes,* a plurality of the Court opined that the federal Occupational Safety and Health Act (OSH Act) and related regulations preempted worker safety standards enacted by Illinois. Examining "the provisions of the whole law, and ... its object and policy," the plurality held that "nonapproved state regulation of occupational safety and health issues for which a federal standard is in effect is impliedly preempted as in conflict with the full purposes and objectives of the OSH Act." *Id.* —— U.S. at ——, 112 S.Ct. at 2383. The OSH Act includes provisions by which a state wishing to implement its own comprehensive worker safety and health laws is required to submit its plan to the Secretary of Labor for approval; if approved, the state law is implemented, and the OSH Act does not apply. *Id.;* 29 U.S.C. § 667. The fact that Congress included these approval provisions for state laws, viewed "in light of the OSH Act's surrounding provisions," indicated to the plurality Congress's intent to

---

4. ITA also argues that the ordinance is specifically preempted by the Interstate Commerce Act, 49 U.S.C. §§ 10521–30. In fact, the ICA specifically exempts from Interstate Commerce Commission jurisdiction

  (1) transportation provided entirely in a municipality, in contiguous municipalities, or in a zone that is adjacent to, and commercially part of, the municipality or municipalities, [and]
  . . . .

  (3) the emergency towing of an accidentally wrecked or disabled motor vehicle.

49 U.S.C. § 10526(b). ITA claims that exemption (3) illustrates the distinction they draw between "consensual" and "non-consensual" tows, *see* part III of this opinion; but on their faces, these subsections of the statute indicate Congress's intent not to preempt local towing services. This is enough to reject this aspect of ITA's argument.

permit state health and safety regulation only where the state "is willing completely to displace the applicable federal regulations." *Id.* —— U.S. at ——, 112 S.Ct. at 2384. While the OSH Act included a saving clause,[5] the plurality held that this "preservation of state authority in the absence of a federal standard presupposes a background pre-emption of all state occupational safety and health standards whenever a federal standard governing the same issue is in effect." *Id.* Similarly, the plurality pointed to § 18(h) of the OSH Act, which permits a state to enter into an agreement with the Secretary of Labor allowing it to continue enforcing its existing worker health and safety laws until such time that the Secretary passes judgment on a submitted state plan. 29 U.S.C. § 667(h). In the plurality's view, this provision, too, suggested that Congress intended the OSH Act automatically to supplant all kindred state laws and regulations upon its enactment. *National Solid Wastes,* —— U.S. at —— – ——, 112 S.Ct. at 2384–85.

We think that the MCSA bears at most a cosmetic resemblance to the OSH Act. Because the substantive factors militating in favor of preemption in the OSH Act largely are absent from the MCSA, we distinguish *National Solid Wastes* from the case at bar. As the *National Solid Wastes* Court recognized, "the question whether a certain state action is pre-empted by federal law is one of congressional intent. The purpose of Congress is the ultimate touchstone." *National Solid Wastes,* —— U.S. at —— – ——, 112 S.Ct. at 2381–82 (quotations and citations omitted). In comparing these statutes, a logical place to begin, then, is with each law's "findings" and "declaration of purpose."

The OSH Act requires the Secretary of Labor "to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce." 29 U.S.C. § 651(b)(3). States are "encourag[ed] to assume ... responsibility for the administration and enforcement of their occupational safety and health laws"; the states are to receive grants to help them "develop plans in accordance with the provisions of this chapter." *Id.* § 651(b)(11). The MCSA's statement of purpose, on the other hand, does not speak in terms of imposing "mandatory" federal standards; the Act's purposes are

> to promote the safe operation of commercial motor vehicles, to minimize dangers to the health of operators of commercial motor vehicles and other employees[, and] ... to assure increased compliance with traffic laws and with the commercial motor vehicle safety and health rules, regulations, standards, and orders issued pursuant to this Act.

49 U.S.C. app. § 2501. Further, in enacting the MCSA, Congress found that "interested State governments can provide valuable assistance to the Federal Government in assuring that commercial motor vehicle operations are conducted safely and healthfully." *Id.* § 2502(4). This suggests that Congress intended not to supplant state laws regulating motor carriers, but to supplement them; state laws would only be preempted where they stood in the way of achieving Congress's goal of "improved, more uniform commercial motor vehicle safety measures and strengthened enforcement." *Id.* § 2502(2).

Comparing the two statutes' provisions specifically addressing preemption of state laws bears out this initially apparent distinction in intent. The "structure and purpose" of the OSH Act "as a whole" gives states two choices. A state may elect to do nothing and submit to the comprehensive federal statutory and regulatory worker health and safety scheme set out by the OSH Act, in which case the OSH Act permits no state occupational health and safety laws to remain in force, or the state may choose to submit to the Secretary of Labor a comprehensive state statutory and regulatory worker health and safety plan that satisfies the minimum substantive and procedural requirements set out by Congress. *See* 29 U.S.C. § 667. If the Secretary approves the state plan, then all worker health and safety matters remain

---

5. The saving clause provides:
    Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under section 655 of this title. 29 U.S.C. § 667(a).

exclusively within that state's purview; the OSH Act ceases to have effect except insofar as the Secretary retains oversight responsibility with regard to the administration of state plans. *See* 29 U.S.C. § 667(f); *see also National Solid Wastes,* —— U.S. at —— ——, 112 S.Ct. at 2384–85. Structured this way, the OSH Act does not permit a state "selectively to 'supplement'" the federal worker health and safety laws with its own; to permit this "would be inconsistent with this federal scheme of establishing uniform federal standards, on the one hand, and encouraging States to assume full responsibility for development and enforcement of their own OSH programs, on the other." *Id.* —— U.S. at ——, 112 S.Ct. at 2385.

This "all or nothing" approach contrasts vividly with the "structure and purpose" of the MCSA; with regard to existing state law, the MCSA's attitude might best be characterized as "if it ain't broke, don't fix it." The MCSA does not purport to set up a comprehensive regulatory scheme, but to "establish minimum Federal safety standards for commercial motor vehicles." 49 U.S.C. app. § 2505(a). In promulgating regulations, the Secretary must "consider ... State laws and regulations pertaining to commercial motor vehicle safety in order to minimize unnecessary preemption under this Act." 49 U.S.C. app. § 2505(c)(2)(B). Like the OSH Act, the MCSA requires the Secretary (of Transportation) to review state laws and regulations to ensure they comport with these minimum standards and do not impose excessive burdens on interstate commerce. 49 U.S.C. app. § 2506.

But the process as well as the substance of this review differs drastically from that prescribed by the OSH Act, and does not evidence or even suggest an intent to preempt state and local laws that the Secretary does not review or otherwise act upon. The statute requires "[a]ny State which enacts, adopts, issues, or has in effect any law or regulation pertaining to commercial motor vehicle safety and is interested in having in effect and enforcing such law or regulation

after the last day of the 60–month period beginning on October 30, 1984" to submit a copy of such law or regulation to the Secretary for review. 49 U.S.C. app. § 2506(a).[6] However, if a state or locality does not submit its laws for review as "required," the only consequence is that "the Safety Panel [a review board authorized by the statute to review state and local laws on the Secretary's behalf] shall analyze the laws and regulations of such State and determine which of such State's laws and regulations pertain to commercial motor vehicle safety." *Id.* § 2506(e). It may seem odd that a state's obstinance or neglect in submitting its laws for review should automatically shift to the Secretary and the Panel the responsibility of ferreting out potentially incompatible laws, but so says the statute. More importantly to the lawsuit at bar, this arrangement certainly does not support ITA's argument that the review provisions act to preempt state and local law even in the absence of affirmative steps by the Secretary.

The MCSA does not itself establish, or direct the Secretary to establish, a complete and comprehensive scheme regulating commercial transportation. Thus, while the OSH Act makes states choose between submitting to the federal plan and submitting their own comprehensive state regulatory schemes for approval by the Secretary, as discussed, the MCSA's review provisions necessarily anticipate that the states and the federal government will share responsibility for motor carrier regulation. No doubt for this underlying reason, the MCSA does not state, nor does its language suggest, that a state regulation must *pass* the Secretary's review as a prerequisite to its remaining in force after the effective date of the MCSA. Again, as we have just observed, the statute allows to remain in force individual state regulations which have not been affirmatively found, by the Secretary or by the Panel, to conflict with federal regulations. The section of the MCSA dealing specifically with "Review and preemption of State regulations," § 2507, provides:

---

**6.** For the purposes of the MCSA's review provisions, "state" includes "a political subdivision of

a State." 49 U.S.C. app. § 2503(10).

After the last day of the 60 month period beginning on October 30, 1984, no State may have in effect or enforce with respect to commercial motor vehicles any State law or regulation pertaining to commercial motor vehicle safety *which the Secretary finds under this section may not be in effect and enforced.*

49 U.S.C. app. § 2507(a) (emphasis added). Particularly when viewed in light of Congress's ability to preempt state law wholesale, as it did in the context of the OSH Act as already discussed, this provision plainly indicates that if the Secretary takes no action to review a particular state or local law, or makes no preemption finding with regard to such law, it is not preempted.

The substance of the MCSA's review procedure bolsters this conclusion. In reviewing these individual state motor vehicle safety laws, the Secretary or the Safety Panel "shall determine if such law or regulation (i) has the same effect as; (ii) is less stringent than; or (iii) is additional to or more stringent than; the regulation issued by the Secretary." 49 U.S.C. app. § 2507(b)(2)(A). Those state regulations found to be "less stringent" than their federal counterparts are preempted. *Id.* § 2507(c)(3). State laws that the Secretary finds to "ha[ve] the same effect as a regulation issued by the Secretary ... may be in effect and enforced...." *Id.* § 2507(c)(2). Those state laws the Secretary finds to be "additional to or more stringent than" federal law may also be enforced, excepting only where the Secretary finds, in addition, that "(A) there is no safety benefit associated with such State law or regulation; (B) such State law or regulation is incompatible with the regulation issued by the Secretary ...; or (C) enforcement of such State law or regulation would be an undue burden on interstate commerce." *Id.* § 2507(c)(4).

Unlike the OSH Act scheme, this arrangement does not preclude the coexistence of federal and state regulation of interstate motor carriers; indeed, it does not even preclude the coexistence of identical federal and state measures, but provides means by which the promulgation of federal regulations under the MCSA does not automatically preempt existing state regulation. In the absence of these review provisions, preemption would occur wherever the substance of the federal and state provisions were the same. "[W]hen Congress has 'unmistakably ... ordained' that its enactments alone are to regulate a part of commerce, state laws regulating that part of commerce must fall." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) (citation omitted). Here, Congress has "unmistakably ordained" that a state motor carrier law shall *not* fall unless the Secretary affirmatively decides it must, for the reasons set out in the statute. Of course, the statute's review provisions do not diminish the judiciary's power to determine that the MCSA or related federal regulations preempt particular state motor carrier laws, *see* 49 U.S.C. app. § 2507(g), but if the touchstone of preemption be congressional intent, we certainly find no preemption here.

Regulations, too, promulgated under the MCSA reflect an understanding on the part of the Secretary that Congress did not intend for the MCSA to supplant state motor vehicle laws:

Except as otherwise specifically indicated, subchapter B of this chapter is not intended to preclude States or divisions thereof from establishing or enforcing State or local laws relating to safety, the compliance with which would not prevent full compliance with these regulations by the person subject thereto.

49 C.F.R. § 390.9. Again, the MCSA specifically requires that the Secretary take into account the existence of state motor vehicle safety laws in promulgating regulations so as to "minimize unnecessary preemption." 49 U.S.C. app. § 2505(c)(2)(B). These legislative edicts are wholly inconsistent with a congressional intent to eclipse the states' role in ensuring safe commercial trucking.

Starting with the traditional presumption, then, that "Congress did not intend to displace state law," *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981), adding the "assumption that the historic police powers of the States were not to be superseded by ... Federal [law] unless that was the clear and manifest purpose of Congress," *Rice v. Santa Fe Ele-*

*vator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947), and taking note of the fact that "[i]n no field has [the Supreme Court's] deference to state regulation been greater than that of highway safety regulation," *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 444, 98 S.Ct. 787, 795, 54 L.Ed.2d 664 (1978), we are left in agreement with the district court that Congress intended, and the MCSA works, no implied preemption of state motor carrier regulation on a wholesale basis. As we have discussed, the fact that the MCSA reserves to the Secretary of Transportation the power to review and possibly to declare preempted the City's towing ordinance does not render the ordinance invalid in the absence of specific approval by the Secretary. And the federal motor carrier safety regulations, as promulgated, in no way conflict with the City's towing regulations, as discussed above; in light of Congress's intent to supplement, rather than supplant, existing state and local safety regulations to the greatest extent possible, only if compliance with both federal and City regulations were impossible would preemption occur. We find no such conflict here.[7]

## II.

■ Next, ITA contends that the City ordinance cannot pass muster under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, because of its "discriminatory purpose" and its "unreasonable burden on interstate commerce." The ordinance "facially" discriminates against tow trucks based in Indiana and Kentucky within the 25–mile radius of coverage because "those towing companies bear an unequal burden of the fees paid," ITA argues, citing *American Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987).

We first reject ITA's assertion that the ordinance on its face discriminates against out-of-state towing companies. The ordinance draws no distinction between Ohio and foreign firms and does not specify different application or reach based on state residency or the crossing of Ohio borders. A state or local law that does not on its face "affirmatively discriminate" against interstate transactions does not automatically trigger heightened judicial scrutiny. *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986).

We do not think that *Scheiner* bolsters ITA's Commerce Clause argument. In that case, Pennsylvania had assessed a use tax in the form of fixed annual fees on trucks using interstate highways in that Commonwealth. The stated purpose of the fees was for road improvement and repair. The Supreme Court concluded that this use tax favored Pennsylvania carriers because trucks registered in states other than Pennsylvania bore a greater financial burden in terms of "cost per mile" than did trucks registered in Pennsylvania, which were effectively exempt. 483 U.S. at 286, 107 S.Ct. at 2841. The Court found that assessing flat fees did not reflect " 'a reasonable charge as [the trucks'] fair contribution to the cost of constructing and maintaining the public highways.' " *Id.* at 287 n. 21, 107 S.Ct. at 2842 n. 21 (quoting *Sprout v. City of South Bend*, 277 U.S. 163, 48 S.Ct. 502, 72 L.Ed. 833 (1928)).

*Scheiner* is clearly distinguishable from the case at bar. The City's $80 fee cannot properly be characterized as a *user* fee, as was the tax in *Scheiner*. Rather, the City's fee is assessed to help defray the costs of inspecting towing vehicles to ensure that all trucks providing towing services within City limits, Ohio-based and out-of-state-trucks

---

**7.** We find support for our conclusions in the Fourth Circuit case of *Specialized Carriers & Rigging Ass'n v. Virginia,* 795 F.2d 1152 (4th Cir. 1986). Plaintiffs there challenged the MCSA more narrowly, arguing that federal regulations requiring interstate trucks to be equipped with certain lighting preempted a Virginia law requiring amber flashing lights on oversize-loaded trucks. Nonetheless, looking at many of the same MCSA provisions we have discussed here, the court noted (field preemption not having been specifically argued) that "no comprehensive preemption was contemplated or intended," opining that "Congress intended an accommodation with state regulation." *Id.* at 1155–56. The court ultimately disposed of the case on Commerce Clause grounds, holding that the district court correctly found the Commonwealth's interests in wide-load safety to outweigh the "slight burden on interstate commerce." *Id.* at 1159–60.

alike, meet certain standards of safety and are equipped sufficiently to provide "first-class" service. The fee is not charged for the privilege of using the City's streets, nor are City- or Ohio-based tow trucks exempt from the fee.

Perhaps more importantly, the City's ordinance does not impose different burdens based only, or even incidentally, on state citizenship or origin. The state boundaries are entirely irrelevant to this fee. ITA asserts that the "per-mile" cost of the fee is higher for towing companies based in Kentucky and Indiana than for those based in Ohio, but there is no defensible basis for this assertion. While the burden of the fee is indeed less, as a percentage of revenue, for those firms that do more business in Cincinnati, this has nothing to do with the towing company's home *state*. And the fact that some of the firms on which the fee may fall more heavily, due to infrequent trips to the City, are based across state borders does not render the fee impermissible.

The City deems safety, minimum levels of service, and consumer protection necessary for the provision of towing services within its borders. Such concerns have consistently been regarded as legitimate, innately local in nature, and presumptively valid, even where regulations enacted to address those concerns have an impact on interstate commerce. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).[8] Thus,

[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of

the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* (citation omitted). Here, despite ITA's protestations to the contrary, Cincinnati's ordinance does "regulate[ ] even-handedly," applying equally to all towing firms seeking to tow cars from the streets of the City. We have pointed out that the metropolis's serendipitous location in an area where three states converge does not mean the City cannot regulate local activities which, as a result of this location, entail movement across state lines; at best, such movement affects interstate commerce only incidentally. *See id.* And we have concluded that the City's interest in regulating tow trucks is legitimate. Thus, the only question left is whether the burdens the City has placed on interstate commerce exceed the City's benefits.

As practiced by those firms based within the radius defined by the ordinance, even those across state borders from Cincinnati, the towing of vehicles, regulated by the ordinance, is primarily a local service. Certainly, a tow truck based in Kentucky (or for that matter in Ohio) may haul a vehicle across a state border in the process of performing a tow. Particularly in a sprawling municipality such as "Greater Cincinnati," spreading as it does over state borders, even a trip to the grocery store may involve interstate travel, but this fact is incidental to the local nature of the activities in question here, and this accident of geography does not magically transform a local service into "interstate commerce" properly regulated only by the federal government. The services Al's Towing Service renders in Cincinnati, perhaps changing a tire, perhaps moving a wreck, and the like, may involve Al's trucks' crossing

---

8. Courts have consistently upheld municipal ordinances regulating towing services, finding such services to be essentially local and within the purview of the police powers. *See, e.g., People v. Merksamer,* 139 Misc.2d 987, 529 N.Y.S.2d 941 (N.Y.Vill.Ct.1988) (holding municipal ordinance a valid effort "to enact procedures and provisions intended to safeguard the public from fraud, exorbitant rates and other tow car abuses adversely affecting the public interest, as well to assure, within reason, that disabled vehicles are promptly removed from the highways and streets so as not to impede the free flow of traffic"); *Kunz v. City of St. Louis,* 602 S.W.2d 742 (Mo.Ct. App.1980); *Utter v. State,* 571 S.W.2d 934 (Tex. Crim.App.1978) (upholding local towing ordinance and licensing fee); *City of Chattanooga v. Fanburg,* 196 Tenn. 226, 265 S.W.2d 15 (1954); *Librizzi v. Plunkett,* 16 A.2d 280 (N.J.1940).

state borders, but such services nonetheless raise the City's legitimate safety, consumer protection, and traffic-related concerns, and may be regulated without doing harm of constitutional proportions to interstate commerce. The line of cases leading up to *Scheiner,* and those cases which have held certain fees, licenses, and other local regulations impermissibly to burden interstate commerce have all dealt with trades that consist solely or essentially of interstate carriage. In such cases, the Court has read between the statutory lines to see whether a state or municipality actually has a defensible interest in regulating this commerce, or whether it is, in a sense, extorting money in exchange for permitting interstate commerce within its jurisdiction.[9]

The City towing ordinance protects inarguably important municipal interests. ITA's contention that no out-of-state tow truck summoned to the City by a motorist or auto club has ever caused safety problems or given rise to consumer complaints does nothing to diminish the City's interest in making sure no such problems arise, and the regulations and required inspection seem properly directed toward that goal.[10] More importantly, since the mandates of the City ordinance promote the public safety and consumer confidence in the regulated services, we must assume that the ordinance also benefits the towing companies themselves. The Supreme Court has

> sustained nondiscriminatory, properly apportioned state corporate taxes upon foreign corporations doing an exclusively interstate business when the tax is related to a corporation's local activities and the

State has provided benefits and protections for those activities for which it is justified in asking a fair and reasonable return.... "[T]he validity of the tax rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation.... In other words, the question is whether the State has exerted its power in proper proportion to appellant's activities within the State and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded."

*Colonial Pipeline Co. v. Traigle,* 421 U.S. 100, 108–09, 95 S.Ct. 1538, 1543, 44 L.Ed.2d 1 (1975) (quoting *General Motors Corp. v. Washington,* 377 U.S. 436, 440–41, 84 S.Ct. 1564, 1567–68, 12 L.Ed.2d 430 (1964), *overruled in part by Tyler Pipe Indus., Inc. v. Washington State Dep't of Revenue,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987)). Where a state or municipality exacts a fee for inspection of goods or equipment involved in interstate commerce, such assessments have only been found to interfere impermissibly with interstate commerce where excessive or where the locality has no defensible interest in such inspections. *See Bourjois, Inc. v. Chapman,* 301 U.S. 183, 187–88, 57 S.Ct. 691, 694–95, 81 L.Ed. 1027 (1937) (upholding state registration and inspection fees imposed on cosmetics business). Further, "[t]he mere fact that the fees imposed might exceed the cost of inspection is immaterial." *Id.* at 188, 57 S.Ct. at 694. Here, ITA has introduced no evidence that the $80 annual fee does not fairly represent the total value of the City's

---

**9.** *See, e.g., Bourjois, Inc. v. Chapman,* 301 U.S. 183, 57 S.Ct. 691, 81 L.Ed. 1027 (1937) (upholding Maine statute requiring registration of dealers and manufacturers of cosmetics, as well as inspection and registration of cosmetic products); *Lemke v. Farmers' Grain Co.,* 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458 (1922) (invalidating North Dakota law regulating and requiring licensing of interstate traders in grain); *Robbins v. Taxing Dist. Shelby County,* 120 U.S. 489, 7 S.Ct. 592, 30 L.Ed. 694 (1887) (holding invalid a municipal tax on local agents of companies hired to solicit orders for goods as burdening out-of-state companies almost exclusively).

**10.** At trial, plaintiffs elicited testimonial evidence that the City inspections were somewhat lax and

that certified mechanics or inspectors were not employed. While non-compliance with established enforcement measures does suggest ulterior motives for a regulatory scheme, particularly where part of the inspection involves collection of the fee, the evidence does not indicate that this ordinance is simply a ruse. Imperfect enforcement does not render an underlying statute unconstitutional. *See Hameetman v. City of Chicago,* 776 F.2d 636, 641 (7th Cir.1985) ("The Constitution does not require states to enforce their laws (or cities their ordinances) with Prussian thoroughness as the price of being able to enforce them at all.")

inspection and the benefits the municipal regulation confers on the towing firms.

ITA asks us to envision a world where every municipality, from major cities on down to the smallest hamlet, imposed identical towing ordinances. In that event, they argue, interstate commerce would surely be unduly burdened; "most towing firms would likely be unduly restricted to operating in but a few local jurisdictions." They assert that if such a result could occur, the ordinance in question surely must be invalid. In support of this argument, they invoke the so-called "internal consistency" requirement, applied in *Scheiner*, which invalidates state taxation schemes that, "if applied [identically] by every jurisdiction," would impermissibly burden free trade. *Scheiner*, 483 U.S. at 284, 107 S.Ct. at 2840.[11]

Envisioning such a world is not difficult, since municipal regulation of the business of towing is not unusual. *See supra* note 8. In any case, even if all the municipalities in the Greater Cincinnati area enacted identical statutes, we do not think the effect would be "to threaten the free movement of commerce by placing a financial barrier" around each jurisdiction equivalent to the one Pennsylvania erected, and the Court invalidated, in *Scheiner*. *See* 483 U.S. at 284, 107 S.Ct. at 2840. In that case, the Court noted that it had consistently held invalid the imposition of an "unapportioned flat tax" on activities where "the very nature of the market that interstate operators serve prevents them from making full use of the privilege of doing business for which they have paid the State." *Id.* at 284 n. 16, 107 S.Ct. at 2840 n. 16. Ours is not a case, however, in which the City has imposed a tax only "for the privilege of making commercial entrances into its ter-

ritory," *id.* at 284, 107 S.Ct. at 2840, but one where the City is simply trying to regulate what it reasonably thinks is a potentially dangerous or troublesome activity carried on within its borders.[12] As we have discussed, towing services are essentially local in nature, and give rise to legitimate local concerns about safety, consumer protection, and the like. And again, just because Cincinnati, or any other municipality, happens to be located on a state border does not alter this essential character of towing, transforming an otherwise local service into "interstate motor carriage" and rendering the otherwise neutrally applicable provisions of the Ordinance "impermissible burdens" on interstate commerce.[13] Granted, it might be inconvenient for towing services if they had to be licensed in every city from which they wished to tow vehicles, and indeed, some might choose to operate in only a select few; but what contractor has not been frustrated by local building codes, or what developer has not been frustrated by the variability of zoning boards and planning commissions? And while we acknowledge that towing services are not directly comparable to land-use regulation, the local nature of their business is much closer to that of building and construction, or any other regulated business, than to the interstate transportation of goods—despite the fact that towing services conduct their business on wheels. In the final analysis, this sort of regulation—local business regulation that applies to those within the city in precisely the same way as it does to those without—is properly overseen by the local political process, not the Commerce Clause. We therefore hold that the City's regulation of the towing of vehicles from property within the City does not impose an

11. Writing for this court, Judge Nelson has aptly described this test as being "reminiscent of Kant's categorical imperative." *Brown–Forman Co. v. Tenn. Alcoholic Beverage Comm'n*, 860 F.2d 1354, 1361 (6th Cir.1988).

12. As we have explained, the City does not impose its regulations on all tow trucks within a 25–mile radius of City limits; it imposes its regulations on tow trucks *based* within that radius that perform towing services *within* City limits.

13. We also note that the "internal consistency" argument has yet to be employed to invalidate

state legislation outside the specific context of taxation; we therefore would hesitate to extend the Court's "Kantian" doctrine to encompass other types of regulation of interstate commercial activities. *See Scheiner*, 483 U.S. at 303, 107 S.Ct. at 2850–51 (O'Connor, dissenting) (objecting to Court's unwarranted extension of the applicability of the "internal consistency" test from facially discriminatory state taxes to facially nondiscriminatory state taxes (suggesting that "internal consistency" test does not apply to all types of taxes, much less state regulation generally)).

impermissible burden on interstate commerce.

### III.

■ Citing the Due Process [14] and Equal Protection Clauses of the Fourteenth Amendment, ITA challenges the ordinance, as applied to Al's and to similarly situated towing companies, as being discriminatory, lacking a rational basis, and not furthering a legitimate municipal purpose. Al's Towing is based across the Kentucky state line from the City and within the 25–mile radius of the ordinance's coverage. ITA says that Al's, and operators like it, perform only "consensual" tows within City limits. A "consensual" tow, they contend, happens where a vehicle owner contacts the wrecking company of his choice, and asks for a tow to a specific location. ITA argues that in this type of tow, the consumer is fully informed as to the price, the service to be rendered, and the identity of the provider ahead of time. In contrast, the archetypical "non-consensual" tow occurs where the owner parks his car illegally and returns to find it gone. In that case, ITA contends, the owner has no control over who tows the car, the type of service rendered, the destination of the towed vehicle, and the price to be paid. ITA argues that the ordinance only rationally applies to the non-consensual tow situation.

■ Carving out "consensual" towing from "non-consensual" towing seems to us to be making a distinction without a difference, and certainly not a distinction of constitutional dimension. ITA's argument that the City has no legitimate interest in regulating consensual tows is at heart a contention that the ordinance is impermissibly overbroad. For example, they contend that the City need not regulate the price of consensual tows since the motorist who phones a particular towing company presumably has shopped around to find the best deal, whereas wreckers who tow away illegally parked cars, without owner consent, have the motorists at their mercy

and may charge extortionate rates for the return of the vehicles. Evidence that an ordinance, in seeking to achieve its ends, imposes "unnecessary" burdens on those who are not causing the problem to be remedied does not help to prove the provision incompatible with equal protection. *See, e.g., New York City Transit Auth. v. Beazer*, 440 U.S. 568, 587–95, 99 S.Ct. 1355, 1366–71, 59 L.Ed.2d 587 (1979) (City's "unwise" and "broader than necessary" prohibition on hiring persons being treated for heroin addiction with methadone to drive trains and buses not violative of Equal Protection Clause). A municipality's painting with a broad brush when solving a problem of legitimate local concern does not require its laws and regulations to be struck down unless those laws place excessive and unwarranted burdens on protected classes of persons.[15] *Id.*

ITA also revives its argument that the federal government already regulates tow trucks such as those operated by Al's and subjects these trucks to stringent highway inspections; ITA contends that the City therefore has no legitimate interest in imposing regulations. It points out the near absence of consumer complaints or safety violations attributable to cross-border "consensual" towing operators. ITA also contends that the ordinance's 25–mile radius of coverage is an irrational and arbitrary provision.

■ These arguments suggest that Cincinnati must defend the rationality of its ordinance by proving the existence of an ongoing problem which each facet of the regulations seeks to address. However, the City need not show that its ordinance provides the best means for achieving its stated ends, only that these means are rational in view of its goals. *See Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 488, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955).

[T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is

---

14. The entirety of ITA's due process contention is that towing companies based up to 25 miles outside City limits may not have "actual or constructive knowledge" of the ordinance. This argument lacks merit.

15. ITA cannot seriously contend that towing operators providing "consensual" tows constitute a "protected class," comparable to a racial minority and entitled to heightened judicial protection.

an evil at hand for correction, and that it might be thought that the particular measure was a rational way to correct it. *Id.* at 487–88, 75 S.Ct. at 464. As the City argues in response, ITA may assume too much in asserting that every motorist needing a tow who phones an auto club or a wrecking company is "fully informed" as to prices, levels of service, and so on. A consumer buying an automobile or a can of beans has a myriad of choices, and may be well informed, but government may still require manufacturers and dealers to put warning labels, prices, and product information on some, all, or none the items without violating the Constitution. Similarly, drawing the line defining the reach of the statute 25 miles from the City limits may not be perfect, but it is a rational means of ensuring that tow trucks removing vehicles from City streets are regulated. Balancing such advantages and disadvantages is for the legislatures, not for the courts. *See id.* at 487, 75 S.Ct. at 464.

Recently, an argument very similar to that put forth by ITA here was rejected by a federal district court in New York. In *New Jersey Limousine Assoc. v. Lusk,* No. 98 Civ. 2092, 1991 WL 143710, 1991 U.S. Dist. LEXIS 10047 (S.D.N.Y. July 22, 1991) (unpublished opinion), plaintiffs operated "for-hire" limousine companies in New Jersey that provided frequent service to New York City. As the Cincinnati ordinance does with tow trucks, New York's ordinance requires all "for-hire" vehicles to be registered, inspected, licensed, and bonded, and requires the payment of substantial fees. *Id.* at *6–*7. Plaintiffs challenged the ordinances on commerce clause and on equal protection grounds, among others. The court granted defendant's motion for summary judgment in part, holding for defendant on the equal protection challenge. Plaintiffs had argued that New York had no rational basis for applying the ordinance only to limos picking up passengers in the city and not to those dropping them off. *See id.* at *14. New York City argued that the contact with the city of limos dropping off passengers was de minimis, and the city was properly concerned with ensuring the safety and consumer interests of people who "get into for-hire vehicles in the City[.] ... [T]he City is less concerned with the protection of those members of the public who are picked up by for-hire vehicles in other jurisdictions." *Id.* at *15–*16. The court accepted the city's rationale for making this distinction.

If New York City can make this explicit distinction in the application of its ordinances governing limousines without offending the Equal Protection Clause, then *a fortiori* the Cincinnati ordinance, which does not reach tow trucks "dropping off" vehicles in the City, and which at best is alleged to discriminate only implicitly against "consensual" towing companies, must stand. ITA argues that the City's evidence submitted to show that regulation of towing was needed, for example, evidence that some tow operators would take legally parked cars "hostage" by towing them a few blocks away to another parking lot and then demanding money to reveal to the owner where the car was, does not apply to operators who only come into the City when summoned by a motorist. However, most of the safety regulations, the inspection, the insurance requirements, and so on ostensibly increase the quality and decrease the safety and fraud risks with regard to *all* towing services, regardless of how obtained or provided. We do not find Cincinnati's means of ensuring "first class" towing service irrational, and therefore we uphold the ordinance as valid under the Equal Protection Clause.

## IV.

For the reasons explained, the judgment of the district court in favor of the City of Cincinnati is AFFIRMED.