**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 22 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS
TENTH CIRCUIT

---

V-1 OIL COMPANY,

     Plaintiff-Appellant,

v.

UTAH STATE DEPARTMENT OF
PUBLIC SAFETY; D. DOUGLAS
BODRERO, in his capacity as
Commissioner of Public Safety;
UTAH STATE FIRE MARSHAL
DIVISION, LYNN B. BORG, in his
capacity as Utah State Fire Marshal;
the LIQUEFIED PETROLEUM GAS
BOARD; and the STATE OF UTAH,

     Defendants-Appellees.

No. 96-4090

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 95-CV-504-C)

---

Linette Bailey Hutton (with Peter Stirba on the briefs), Stirba and Hathaway, Salt Lake City, Utah, for Plaintiff-Appellant.

Brent A. Burnett, Assistant Attorney General (with Jan Graham, Utah Attorney General, on the briefs), Salt Lake City, Utah, for Defendants-Appellees.

---

Before SEYMOUR, McKAY, and HENRY, Circuit Judges.

---

HENRY, Circuit Judge.

Plaintiff-appellant V-1 Oil Company appeals the district court's grant of summary judgment in favor of the defendants. V-1 alleges that the defendants' imposition of licensing and certification fees upon its out-of-state liquefied petroleum gas (LPG) facilities constitutes an impermissible tax upon the privilege of engaging in interstate commerce. For the reasons set forth herein, we remand to the district court for vacation of judgment in part, and we affirm in part.

## I. BACKGROUND

V-1 owns and operates four LPG storage facilities within the borders of Utah: one each in Salt Lake City, Woodruff, Manilla, and Ogden. At issue are V-1's facilities in Preston, Idaho and Rock Springs, Wyoming, which sell LPG to private consumers in Utah for home heating as well as to two convenience stores located across the Utah border in the towns of Manilla and Logan, Utah. These Utah customers, estimated to be 500 in number, consume approximately 312,400 gallons of LPG annually, generating approximately $136,000 in annual gross profit. See Aplt's App. doc. F ¶ 9 (Aff. of Gary D. Huskinson, President, V-1 Oil Co.).

In 1993, Utah enacted the Liquefied Petroleum Gas Act, see Utah Code Ann. §§ 53-7-301 to 53-7-316, to provide a comprehensive system of safety

2

regulations for the LPG industry in Utah. The statutes provide for the creation of the Utah Liquefied Petroleum Gas Board to create rules for the protection of the health, welfare, and safety of the public and persons using LPG. See Utah Code §§ Ann. 53-7-304 to -305. The Board, working in conjunction with the Division of the State Fire Marshal, see Utah Admin. Code R710-6, assumes responsibilities including the issuance, suspension, and denial of licenses, the examination of every LPG license applicant, and the collection of fees for any facility that handles LPG. See Utah Code Ann. §§ 53-7-307(3), (9), 53-7-308(4).

Under the LPG Act, a person may not sell, transport, dispense, or store LPG in Utah without a state license. See Utah Code Ann. § 53-7-308. V-1 contests the requirement that its Preston, Idaho and Rock Springs, Wyoming facilities must pay the license and certification fees required in Utah Code Ann. §§ 53-7-309(2)(b), 53-7-314, and Utah Admin. Code R710-6-6. After the Utah Fire Marshal threatened civil penalties and criminal prosecution for nonpayment of the fees covering the Preston facility, V-1 paid the $225.00 fee under protest. V-1 also contests the certification fees for employees that handle LPG under Utah Code Ann. § 53-7-311 and Utah Admin. Code R710-6-6, set at $30.00 per employee annually.

The United States Department of Transportation's Research and Special Programs Administration has issued hazardous materials regulations "to enhance

3

training requirements for persons involved" in the transportation, handling, storing, loading, and unloading of hazardous materials. Aplt's App. doc. J, at 81 (Training for Safe Transp. of Hazardous Materials, 49 C.F.R. pts. 171-177, Summary (1992)). V-1 "maintains annual certification pursuant to the federal safety guidelines [the United States Department of Transportation's regulations] as required by Idaho and Wyoming for its facilities" conducting business in those states. Aplt's App. doc. F ¶ 7; see id. docs. H-I (hazardous materials regulations training information). "V-1 requires that its employees complete initial and recurrent training and examinations as required under [the United States Department of Transportation's regulations] for persons handling or transporting hazardous substances." Aplt's App. doc. F ¶ 8; see id. docs. H-I.

V-1 delivers propane from its storage facilities to its customers in trucks. See id. doc. N, at 99. V-1's vendors deliver propane to its storage facilities either by train or truck. See id. None of V-1's facilities or customers are served by pipeline. See id. at 99-100.

Most of V-1's customers, apart from those who purchase from the retail outlets, are "residential customers located in rural areas." Id. at 100. "In some cases [V-1] provides storage tanks at the service location as part of its service and retains title to the tanks. [V-1] has a few accounts at commercial locations." Id.

"As part of its service, at a customer's request, [V-1] installs service lines from a tank at a customer's location, whether customer-owned or [V-1]-owned to a customer's premises where the propane is used. [V-1] charges for time and materials for such line installation and does not retain title to the line. [V-1] does not assume responsibility for subsequent line maintenance." Id.

In its motion for summary judgment and injunctive relief before the district court, and on appeal, V-1 contends that the assessment, enforcement, and collection of the LPG Act's fees run afoul of the Commerce Clause, U.S. Const. art. I, § 8, cl. 3 ("The Congress shall have Power To . . . regulate Commerce with foreign nations, and among the several States, . . . ."). V-1 claims that its Preston, Idaho and Rock Springs, Wyoming facilities and their employees are compelled to pay these fees, and in theory, the Utah Fire Marshal in return conducts inspections at the facilities. Because defendants have performed no inspections of V-1's out-of-state facilities, V-1 contends that it is paying the State of Utah a fee for the privilege of entering the state to transact business, which discriminates against interstate commerce. V-1 asks that the defendants be enjoined from assessing any and all fees under the LPG statutes, and that they reimburse V-1 for all monies paid for licensing at its out-of-state facilities, and for reimbursement of the fees paid for the certification of its agents, salesmen and employees at these facilities.

5

In their motion to dismiss, the defendants argued that under the prevailing four-prong test outlined in Complete Auto Transit Inc. v. Brady, 430 U.S. 274 (1977), they are justified in imposing a reasonable tax on V-1's out-of-state facilities.

Noting that the defendants' motion to dismiss relied on matters outside of the pleadings, the district court appropriately treated it as a motion for summary judgment, see Brown v. Zavaras, 63 F.3d 967, 969 (10th Cir. 1995) ("A court may convert a Rule 12(b)(6) motion to dismiss into a summary judgment proceeding in order to consider matters outside of the plaintiff's complaint."), and ruled in favor of defendants on all issues. This appeal followed.

.

## II. DISCUSSION

## A. Eleventh Amendment Immunity

"At the outset, we note that because [V-1 has] brought suit in federal court against [d]efendants in their official capacities as directors of Utah state agencies," against two state agencies and against the State of Utah, V-1's "suit may be barred in part or whole by the Eleventh Amendment." Johns v. Stewart, 57 F.3d 1544, 1552 (10th Cir. 1995) (citing Pennhurst State Sch. & Hosp. v.

6

<u>Halderman</u>, 465 U.S. 89, 101 (1984)).  At oral argument before this court, we raised the question of the Eleventh Amendment bar.  The State of Utah admitted it chose not to raise the potential constitutional limitation of our subject matter jurisdiction at either the district or appellate level.

1. <u>Sua Sponte Consideration of Eleventh Amendment Immunity</u>

Unlike most jurisdictional questions which <u>must</u> be considered by the court on its own motion if the parties fail to raise them, whether sua sponte consideration of a possible Eleventh Amendment bar is obligatory or discretionary "has been subject to prolonged debate."  <u>Mascheroni v. Board of Regents of the Univ. of Calif.</u>, 28 F.3d 1554, 1558 (10th Cir. 1994).  The Supreme Court appears not to have decided whether consideration of the Eleventh Amendment bar is required or optional.  <u>Compare</u> <u>Pennhurst</u>, 465 U.S. at 98 (noting that the Eleventh Amendment "affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art[icle] III") <u>with</u> <u>Patsy v. Board of Regents</u>, 457 U.S. 496, 515 n.19 (1982) (stating that the Court has "never held that [the Eleventh Amendment bar] is jurisdictional in the sense that it must be raised and decided by this Court in its own motion").

In Mascheroni, we outlined the circuit split between mandatory and permissive sua sponte consideration of the Eleventh Amendment bar. See 28 F.3d at 1558 (collecting authority). We also noted that this circuit in recent cases has not explicitly adopted either rule, but has "in fact consider[ed] sua sponte whether the Eleventh Amendment barred its jurisdiction." Id. As we have previously raised the issue sua sponte, we will do so here.

2. Eleventh Amendment Provisions

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. "Even though the clear language does not so provide, the Eleventh Amendment has been interpreted to bar a suit by a citizen against the citizen's own State in Federal Court." AMISUB (PSL), Inc. v. Colorado Dep't of Soc. Servs., 879 F.2d 789, 792 (10th Cir. 1989) (citing Hans v. Louisiana, 134 U.S. 1, 10 (1890)). As such, "the Eleventh Amendment bars a suit brought in federal court by the citizens of a state against the state or its agencies," Johns, 57 F.3d at 1552 (citing Pennhurst, 465 U.S. at 100), "'whether the relief sought is

8

legal or equitable.'" Id. (quoting Ramirez v. Oklahoma Dep't of Mental Health,

41 F.3d 584, 588 (10th Cir. 1994) (quoting Papasan v. Allain, 478 U.S. 265, 276

(1986))). Utah, the state's governmental bodies, as arms of the state[1]

_____

[1] The parties did not brief the issue, but on the record before us, it appears that the Utah State Department of Public Safety, the Utah State Fire Marshal Division and the Liquefied Petroleum Gas Board are arms of the state, and as such, they are entitled to Eleventh Amendment immunity. See Regents of the Univ. of Cal. v. Doe, 117 S. Ct. 900, 903 (1997) ("It has long been settled that the reference to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities.") (emphasis added). The question of whether a particular state agency has Eleventh Amendment immunity is a question of federal law. Regents of the Univ. of Cal., 117 S. Ct. at 904 n.5. "But that federal question can be answered only after considering the provisions of state law that define the agency's character." Id.

"To make the determination whether an entity is an arm of the state we engage in two general inquiries." Watson v. University of Utah Med. Ctr., 75 F.3d 569, 574 (10th Cir. 1996). "[T]he court first examines the degree of autonomy given to the agency, as determined by the characterization of the agency by state law and the extent of guidance and control exercised by the state. Second the court examines the extent of financing the agency receives independent of the state treasury and its ability to provide for its own financing." Haldeman v. Wyoming Farm Loan Bd., 32 F.3d 469, 473 (10th Cir. 1994).

Utah's Governmental Immunity Act defines the "State" to include "the state of Utah, and . . . any office, department, agency, authority, commission, [and] board. . . ." Utah Code Ann. § 63-30-2(9). By contrast, under the statute, Utah's political subdivisions encompass "any county, city, town, school district, public transit district, redevelopment agency . . . or other governmental subdivision or public corporation." Id. § 63-30-2(7).

As to the Utah Department of Public Safety, it is a department of the state government's executive branch, see Utah Code Ann. § 53-1-103, and its commissioner is appointed and his salary determined by the governor. See id. § 53-1-107(2)(a)(5). The commissioner has "recognized executive and administrative capacity." Id. § 53-1-107(3)(a). The Department has many policy-making functions within the executive branch. See id. § 53-1-106. It is clearly an arm of the state.

The Utah State Fire Marshal Division, a division of the Department of Public Safety, "complete[s] the duties assigned by the commissioner [of Public Safety]." Id. §

(here, the Utah Department of Public Safety, the Utah State Fire Marshal Division, and the Utah Liquefied Petroleum Gas Board), and Utah's "state officials sued in their official capacities would, therefore, normally be immune from suit in the federal courts." In re SDDS, Inc., 97 F.3d 1030, 1035 (8th Cir. 1996); see Mascheroni, 28 F.3d at 1559.

In Ex parte Young, 209 U.S. 123, 155-56, 159 (1908), the Supreme Court held that individuals may sue state officials in their official capacities for prospective injunctive relief, establishing an exception to the Eleventh Amendment immunity doctrine. See Green v. Mansour, 474 U.S. 64, 68 (1985). Insofar as V-1 seeks prospective injunctive relief from Utah's alleged ongoing violation of the Commerce Clause, Utah state officials do not enjoy immunity

---

53-7-103(4)(b). The division enforces its rules in several areas, including on state-owned property, and school-district owned property. Id. § 53-7-104(3)(b). It too is an arm of the state.

Finally, the Liquefied Petroleum Gas Board, a policymaking board within the Department of Public Safety, is also an arm of the state. See id. § 53-1-104(1)(d). The governor appoints the members of the Board. In addition, any "[f]ees collected by the division under this part shall be deposited with the state treasurer . . . ." Id. § 53-7-314. As "alter egos or instrumentalities" of the State, each entity is immune from suits in law or equity under the Eleventh Amendment. Watson, 75 F.3d at 574.

under the Eleventh Amendment.  See In re SDDS, 97 F.3d at 1035; Johns, 57 F.3d

at 1555.[2]



3. Did Utah Waive its Eleventh Amendment Immunity?


The defendants do not dispute that they have appeared throughout this

action without invoking Eleventh Amendment immunity or that "[a] state may

waive its Eleventh Amendment immunity and consent to suit in federal court."

Johns, 57 F.3d at 1553.  However, "[t]he mere fact that [the defendants] ha[ve]

---

[2]  Some scholars have suggested that the Supreme Court's recent decision in
Seminole Tribe of Fla. v. Florida, 116 S. Ct. 1114 (1996), calls into question the
continued validity of  Ex parte Young.  See e.g., Vicki C. Jackson, Seminole Tribe, The
Eleventh Amendment & the Potential Evisceration of Ex Parte Young, 72 N.Y.U. L. Rev.
495 (1997).  However, the Court was careful in Seminole Tribe to distinguish Ex parte
Young.  Specifically, the Supreme Court commented on the "narrow exception to the
Eleventh Amendment provided by the Ex parte Young doctrine," 116 S. Ct. at 1133, and
held that "Ex parte Young was inapplicable to petitioner's suit," id., explaining that the
suit against the Governor of Florida was barred because "Congress does not have
authority under the Constitution to make the State suable in federal court under [the
Indian Regulatory Gaming Act]." Id.  Thus, we agree with the Second Circuit that Ex
parte Young is still viable.  See Burgio & Campofelice, Inc. v. New York State Dep't of
Labor, 107 F.3d 1000, 1007 (2d Cir. 1997) (noting that the "[Supreme] Court in Seminole
Tribe took great pains to assert the continued viability of Ex parte Young") (citing
Seminole Tribe, 116 S. Ct. at 1131-33, nn. 14, 16-17).  See also David Currie, Response:
Ex Parte Young After Seminole Tribe, 72 N.Y.U. L. Rev. 547, 547  (1997) ("Not to
worry; Ex parte Young is alive and well and living in the Supreme Court.") (citation
omitted).

11

appeared in this suit, without explicitly invoking Eleventh Amendment immunity

does not, by itself, constitute a waiver of Eleventh Amendment immunity."

Mascheroni, 28 F.3d at 1560.  A state's waiver is subject to a stringent test:

Utah's consent to suit against it in court must be express and unequivocal.  See

Pennhurst, 465 U.S. at 99.  A state may waive its Eleventh Amendment immunity

"only where stated 'by the most express language or by such overwhelming

implication from the text [of a state statutory or constitutional provision] as [will]

leave no room for any other reasonable construction.'"  Atascadero State Hosp. v.

Scanlon, 473 U.S. 234, 239-40 (1985) (quoting Edelman v. Jordan, 415 U.S. 651,

673 (1974)).

As we have concluded previously, there is no Utah statutory or

constitutional provision that expressly waives the state's Eleventh Amendment

immunity with respect to the claims V-1 alleges here.  See Johns, 57 F.3d at 1554.

> Although Utah has several general consent to suit provisions in its
> Governmental Immunity Act, Utah Code Ann. § 63-30-1 to 63-30-38,
> which waive its immunity to suits brought in Utah state courts, "a
> state's consent to be sued in the state's own courts does not serve to
> waive its Eleventh Amendment immunity."  Indeed, Utah law
> expressly provides that its state district courts have exclusive
> jurisdiction over suits brought against it.  Utah Code Ann. § 63-30-
> 16.  This provision clearly evidences Utah's intent to retain its
> Eleventh Amendment immunity.

12

Id. (quoting Richins v. Industrial Constr., Inc., 502 F.2d 1051, 1055 (10th Cir. 1974), and citing Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 306 (1990)). Accordingly, we conclude that Utah has not waived its sovereign immunity.

4. Application of the Eleventh Amendment Bar

The portion of V-1's claims that seeks retroactive monetary reimbursement for licensure and certification fees is barred by the Eleventh Amendment. We therefore dismiss this portion of V-1's claim. See Edelman, 415 U.S. at 662-71; Green, 474 U.S. at 68. We remand with instructions to the district court to vacate its judgment as to this portion of V-1's Commerce Clause claim and dismiss for lack of jurisdiction. See Green, 474 U.S. at 68.

V-1 also seeks a declaration that Utah and its agencies and officials violated the Commerce Clause in the past by imposing licensing and certification fees. Similarly, because the Eleventh Amendment "does not permit judgments against state officers declaring they violated federal law in the past," Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993) (citing Green, 474 U.S. at 68), we dismiss the declaratory portion of V-1's claim.

See id. We remand with instructions to the district court to vacate its judgment as to the declaratory portion of V-1's Commerce Clause claim and dismiss for lack of jurisdiction. See id.; Green, 474 U.S. at 68.

To the extent V-1 seeks to enjoin prospectively Utah officials from violating the Commerce Clause in their official capacities to prevent the ongoing violation of federal law, we will address this portion of V-1's Commerce Clause claim on the merits. See Johns, 57 F.3d at 1555; Green, 474 U.S. at 68.

## B. Imposition of Licensing and Certification Fees

We note at the outset that the parties argued and the district court decided that the LPG Act licensing and certification assessments on V-1's out-of-state facilities are taxes. However, we decline to adopt this approach. We believe that there is considerably more to the police-power-based-regulatory-fee-versus-tax dichotomy than the parties have maintained. While a regulatory police power fee that is reasonable in relationship to its costs is almost always sustained, see Aldens, Inc. v. LaFollette, 552 F.2d 745, 749-50 (7th Cir. 1977), a tax with effects upon interstate commerce is "more carefully scrutinized and more consistently resisted . . . ." Freeman v. Hewit, 329 U.S. 249, 253 (1946). See

14

also Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970) (outlining balancing test for a nondiscriminatory regulation).  Because we may affirm for any grounds supported in the record, see Schalk v. Gallemore, 906 F.2d 491, 498 (10th Cir. 1990), and we hold that the assessments are fees, the former inquiry is applicable here.

We review the district court's grant of summary judgment de novo.  See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).  Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  This court's resolution of the conflict between the constitutional protection of free interstate commerce and the states' reserved power to tax must be accomplished on a case-by-case basis, with the particular facts and statutory characteristics determining the outcome.  Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 329 (1977).

1. Taxes versus Fees

V-1 alleges that the licensing and certification assessments imposed on its out-of-state facilities and employees impermissibly tax the privilege of engaging

in interstate commerce. "The police power of a state and its power to tax are of course treated differently for constitutional purposes." Aldens, 552 F.2d at 749 (citing Freeman, 329 U.S. at 253). "[T]he burden on interstate commerce involved in a direct tax upon it is inherently greater, certainly less uncertain in its consequences, than results from the usual police regulations." Freeman, 329 U.S. at 253. Because "[t]he power to tax is a dominant power over commerce . . . . [a]ttempts at such taxation have always been more carefully scrutinized and more consistently resisted than police power regulations of aspects of [interstate] commerce." Id. Thus, our characterization of the monetary assessment in this case as a tax or as a fee determines the level of scrutiny we shall apply.

2. The Assessments on V-1 Facilities are Fees

   Under Utah law,

> If the money collected is for a license to engage in a business and the proceeds therefrom are purposed mainly to service, regulate and police such business or activity, it is regarded as a license fee. On the other hand, if the factors just stated are minimal, and the money collected is mainly for raising revenue for general municipal purposes, it is properly regarded as the imposition of a tax . . . .

Weber Basin Home Builders Ass'n v. Roy City, 487 P.2d 866, 867 (Utah 1971) (emphasis supplied).

16

Here, the fee is assessed to "service, regulate and police," id., the inspection and certification of LPG facilities and employees. See Aldens, 552 F.2d at 750 (upholding Wisconsin Consumer Act's "fee imposed . . . to cover the costs of administering the [a]ct" as valid exercise of police power). The fee must be in reasonable relation to the cost of policing these activities. See Utah Code Ann. § 53-7-315(5)(d); see Aldens, 552 F.2d at 749-50 (stating that the exercise of "a state's police power . . . is sustainable absent an undue burden on interstate commerce which is clearly excessive in relation to local benefits"); V-1 Oil Co. v. Utah State Tax Comm'n, 942 P.2d 906, 917 (Utah 1996) (holding environmental surcharge a fee and "not[ing] that fixing the amount of a fee is a legislative act to which we grant great deference."). Finally,

> A police regulation of local aspects of interstate commerce is a power often essential to a State in safeguarding vital local interests. At least until Congress chooses to enact a nation-wide rule, the power will not be denied to the State.

Freeman, 329 U.S. at 253.

As in Aldens, the assessments involved here cannot be characterized as use or excise taxes, but rather as an unadorned fee assessed to help defray the costs of inspecting LPG facilities and to ensure that all LPG handlers providing LPG services within the State of Utah meet minimum standards of safety. See 552 F.2d at 750; Interstate Towing Assoc., Inc. v. City of Cincinnati, 6 F.3d 1154,

17

1162-63 (6th Cir. 1993) ("The City's fee cannot properly be characterized as a *user* fee . . . . [r]ather [it] is assessed to help defray the costs of inspecting towing vehicles to ensure that all trucks providing towing services . . . meet certain standards of safety . . . ."). Finally, V-1 concedes "the license and certification fees assessed and collected by the Utah State Office of the Fire Marshal, as assessed against the in-state facilities of V-1 and other suppliers, are properly considered fees" because they are "used to defray the costs of regulation." Aplt's Br. at 10. Furthermore, we can see no discernible difference between the characterization of fees assessed against V-1's in-state facilities and against its out-of-state facilities: if the in-state facility fees are acceptable, the out-of-state facility fees which involve precisely the same kinds of state services, are also acceptable.

3. Analysis of the Fee

There is no question that legitimate state interests may conflict with the national interests expressed by the Commerce Clause, and as such, we review with "sensitive consideration . . . of the state regulatory concern" Utah's regulations, applying a "delicate adjustment" of these conflicting interests.

18

Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 440-41 (1978).  The test that has emerged is as follows:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.  If a legitimate local purpose is found, then the question becomes one of degree.  And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

Pike, 397 U.S. at 142 (citation omitted) (emphasis supplied); see Dorrance v. McCarthy, 957 F.2d 761, 763 (10th Cir. 1992) (applying Pike principles).  Accordingly, we will consider Utah's LPG fees under the three factors outlined in Pike: (1) whether there is the furtherance of a legitimate local public interest; (2) whether the statute regulates evenhandedly; and (3) whether the statute places an undue burden upon interstate commerce.

### a. Legitimate local public interest

V-1 does not dispute that Utah has a legitimate interest in the regulation of the transportation and distribution of LPG within its borders.  Nor does it contend that federal regulation of hazardous materials has pre-empted state regulation of licensing and certification of LPG facilities.

19

Utah deems public safety and consumer protection to be priorities for the provision of LPG services within its borders. See Utah Code Ann. § 53-7-305(1)(a) ("The board shall make rules as reasonably necessary for the protection of the health, welfare, and safety of the public and persons using LPG."). V-1 has presented no evidence to disprove the State's assertion that the regulations of these hazardous materials contribute to furthering the "health, welfare, and safety of the public and persons using LPG." Utah Code Ann. § 53-7-305(a); see id. § 53-7-315(4) (the Fire Marshal "may declare any container, appliance, equipment, transport, or system that does not conform to the safety requirements of this part or the rules or orders of the board, or that is otherwise defective, as unsafe or dangerous for LPG service, and shall attach a red tag in a conspicuous location."); Utah Admin. Code R710-6-3.15 to -16 (the LPG Board may respond to and investigate all serious accidents involving a licensee and LPG). Cf. Raymond Motor Transp., 434 U.S. at 444 ("[A]ppellants produced a massive array of evidence to disprove the State's assertions that the regulations make some contribution to highway safety.").

There is no question that the proper handling of hazardous materials is a valid "regulation of local aspects of interstate commerce" that "is a power . . . essential to a State in safeguarding vital local interests." Freeman, 329 U.S. at

253; see Blue Circle Cement, Inc. v. Board of County Comm'rs, 27 F.3d 1499, 1511 (10th Cir. 1994) (noting that "[l]egislation relating to public safety has long been recognized as an important public interest"). We are reluctant to deny Utah the exercise of its police power, absent an excessive burden on interstate commerce, or Congressional action. See Freeman, 329 U.S. at 253 ("At least until Congress chooses to enact a nation-wide rule, the [police] power will not be denied to the State."); Raymond Motor Transp., 434 U.S. at 443 (noting that "the [Supreme] Court has been most reluctant to invalidate under the Commerce Clause 'state legislation in the field of safety where the propriety of local regulation has long been recognized.'") (quoting Pike, 397 U.S. at 143) (quoting Southern Pac. Co. v. Arizona, 325 U.S. 761, 796 (1945) (Douglas, J., dissenting))). Accordingly, we hold that Utah's LPG statutes effectuate a legitimate local public interest.

*b. Evenhanded Regulation*

Utah's regulations impose the same fees for licensing and certification on in-state based facilities as upon out-of-state facilities. V-1 contests the even-handed nature of the fees, asserting the Utah statutes impermissibly subject it to "double taxation." V-1 pays fees in Idaho and Wyoming, where its Preston and

Rock Springs facilities are based, and also in Utah, whereas Utah-based facilities only pay once to engage in business within the State. As such, V-1 argues, under Utah's fee scheme, "if every State were to impose an identical tax," "multiple taxation would result," which decreases V-1's out-of-state facilities' ability to remain competitive, thereby discriminating against interstate commerce. Aplt's Br. at 17, 20-21 (quoting Goldberg v. Sweet, 488 U.S. 252, 261 (1989)).

There is no tenable basis for this assertion, however. Clearly, Utah-based facilities will pay less, as a percentage of revenues, to engage in business exclusively in Utah, and the percentage will decrease further still if the Utah-based companies engage in a greater amount of business in Utah than does V-1. Cf. Interstate Towing, 6 F.3d at 1163 (noting that the "per-mile" cost of the fee on towing companies may be "less, as a percentage of revenue, for those firms that do more business in Cincinnati, [but] this has nothing to do with the towing company's home state"). Accordingly, under Utah's LPG Act, an LPG company's home state is immaterial because it is unrelated to the percentage of business affected by Utah's LPG licensing fees. See id.

Unlike in American Trucking Associations, Inc. v. Scheiner, 483 U.S. 266, 284 (1987), where Pennsylvania erected, and the Supreme Court invalidated, a tax that essentially "threaten[ed] the free movement of commerce by placing a

22

financial barrier," id., around the state, here, Utah is "trying to regulate what it reasonably thinks is a potentially dangerous or troublesome activity carried on within its borders." Interstate Towing, 6 F.3d at 1165 (upholding municipal ordinance regulating towing of vehicles). The LPG Act discriminates neither in favor of local commerce or against out-of-state commerce. See Oregon Waste Sys., Inc. v. Department of Envtl. Quality of Or., 511 U.S. 93, 108 (1994) (striking down as discriminatory a $2.25 per ton surcharge on solid "waste generated in other States," as opposed to the $0.85 per ton surcharge on in-state waste); Scheiner, 483 U.S. at 290 (invalidating Pennsylvania's weight-based registration fees in combination with an axle tax that "discriminate[d] against out-of-state vehicles by subjecting them to a much higher charge per mile . . . and they do not even purport to approximate fairly the cost or value of the use of Pennsylvania's roads"). The licensing and certification fees are imposed on in-state and out-of-state facilities and employees alike. See Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 471-72 (1981) (upholding Minnesota statute because it regulated evenhandedly "by prohibiting all milk retailers from selling their products in plastic, nonreturnable containers, without regard to whether the milk, the containers, or the sellers [we]re from outside the State"); Baltimore Gas & Elec. Co., v. Heintz, 760 F.2d 1408, 1423 (4th Cir. 1985) (concluding statute

23

that "prevents the acquisition of more than ten percent of the stock of only Maryland public service companies" is an evenhanded regulation). We hold that the LPG Act's fees regulate evenhandedly.

### c. Burden Upon Interstate Commerce

Having determined that the LPG fees are in furtherance of a legitimate local interest, and regulate evenhandedly, we must now evaluate the LPG Act's effects on interstate commerce.

We first examine whether the Act imposes any burden upon interstate commerce. V-1 "bears the burden of showing that the incidental burden on interstate commerce is excessive compared to the local interest." Dorrance, 957 F.2d at 763. The "incidental burdens" of the Pike inquiry "are the burdens on interstate commerce that exceed the burdens on intrastate commerce." New York State Trawlers Ass'n v. Jorling, 16 F.3d 1303, 1308 (2d Cir. 1994) (citing Clover Leaf Creamery, 449 U.S. at 471). Such incidental burdens might also "include the disruption of [interstate] travel and shipping due to a lack of uniformity in state laws, impacts on commerce beyond the borders of the defendant [S]tate, and impacts that fall more heavily on out-of-state interests." Pacific Northwest Venison Producers v. Smitch, 20 F.3d 1008, 1015, 1017 (9th Cir. 1994)

(upholding Washington State's regulations "protecting native wildlife") (internal citations omitted).

Although the LPG Act's fees may have some relatively minor effects on both interstate and intrastate commerce, the fees at issue do not attempt to regulate or prohibit the introduction of LPG into Utah. The fees involved here are not assessed "for the privilege of making commercial entrances into" the State. Scheiner, 483 U.S. at 284. They do not apply to the production, manufacture or refining of LPG. See Utah Code Ann. § 53-7-303(1). They do not apply to transportation of LPG by pipeline, or by railcar, or to pipeline terminals. See id. § 53-7-303(2), (5). In a similar context, the Sixth Circuit emphasized that:

> those cases which have held certain fees, licenses, and other local regulations impermissibly to burden interstate commerce have all dealt with trades that consist solely or essentially of interstate carriage. In such cases, the [Supreme] Court has read between the statutory lines to see whether a state . . . actually has a defensible interest in regulating this commerce, or whether it is, in a sense, extorting money in exchange for permitting interstate commerce within its jurisdiction.

Interstate Towing, 6 F.3d at 1164 (upholding municipal license fees imposed on towing industry) (emphasis added); City of Philadelphia v. New Jersey, 437 U.S. 617, 624, 628 (1978) (when one State "overtly blocks the flow of interstate commerce at a State's borders" or attempts "to isolate itself from a problem

25

common to many by erecting a barrier against the movement of interstate trade," a "per se rule of invalidity has been erected"). As emphasized above, the Utah LPG Act does not "block the flow of interstate commerce" in any discernible way, City of Philadelphia, 437 U.S. at 624, and as such, there is no need to "read between the statutory lines." Interstate Towing, 6 F.3d at 1164. See also Raymond Motor Transp., 434 U.S. at 444-45 (striking down Wisconsin regulation barring double-trailer trucks or vehicles longer than 55 feet from the State's highways emphasizing the "substantial burden" imposed on the "interstate movement of goods"); Bourjois, Inc. v. Chapman, 301 U.S. 183, 186 (1937) (upholding Maine statute requiring registration of dealers and manufacturers of cosmetics because "[i]t does not attempt to prohibit or regulate the introduction of cosmetics into the State"); Lemke v. Farmers' Grain Co., 258 U.S. 50, 53 (1922) (invalidating North Dakota statute regulating and requiring licenses of interstate traders in grain that is primarily "for transportation beyond [the States's] borders").

V-1 argues that by virtue of its Preston and Rock Springs locations near the border of the State, the fees impermissibly burden interstate commerce. See Aplt's Br. at 20-21. However, the near-border locations of V-1's facilities do not transform the "essential character" of the regulated services into an interstate activity, thus "rendering the otherwise neutrally applicable provisions of the

26

[statute] impermissible burdens on interstate commerce." Interstate Towing, 6 F.3d at 1165. Rather, the "state boundaries are entirely irrelevant to this fee." Id. at 1163.

In Interstate Towing, 6 F.3d 1154, the Sixth Circuit upheld a similar municipal statute requiring licensing fees from towing companies. The court examined a Cincinnati ordinance that assessed an $80.00 licensing fee on all towing companies whose places of business were within 25 miles of the city limits. See id. at 1162-63. After determining that the fee was not a user tax, because it was "assessed to help defray the costs of inspecting towing vehicles" to ensure they met certain standards, id. at 1162, the court examined the fee's effect on interstate commerce.

The Interstate Towing court determined that the "towing ordinance protects inarguably important municipal interests," id. at 1164, and that Cincinnati's "serendipitous location in an area where three states converge" did not foreclose it from regulating local activities, which might "entail movement across state lines." Id. at 1163.

Similarly here, V-1 complains it is victimized because of its locations near Utah's borders. However, the regulation of the handling of LPG, a hazardous material, and the provision of fire and police services to ensure the "safety of the

public and persons using LPG," Utah Code Ann. § 53-7-305(1)(a), are undisputedly important local interests. "Such concerns have consistently been regarded as legitimate, innately local in nature, and presumptively valid, even where regulations enacted to address those concerns have an impact on interstate commerce. Interstate Towing, 6 F.3d at 1163 (citing Pike, 397 U.S. at 142). As in Interstate Towing, that the regulated activities might "entail movement across state lines" does not preclude Utah's regulation in this field. We are reluctant to invalidate state legislation that furthers a legitimate local public interest such as this one, which ensures the safety of the States's roads and provides emergency services to the public. There is no evidence that the burdens upon interstate commerce are anything but incidental, and certainly are not "clearly excessive" under Pike. 397 U.S. at 142; see also Aldens, Inc. v. Ryan, 571 F.2d 1159, 1162 (10th Cir. 1978) (concluding that "conformance with the Oklahoma cost of credit rules would not constitute an undue burden on interstate commerce").

V-1 also claims that in exchange for the facility license, its "out-of-state facilities receive *nothing*." Aplt's Br. at 21. V-1 alleges, and the defendants agree, that the State has not inspected V-1's out-of-state facilities (although there is some dispute as to why this is the case, and whether these inspections will take place in the future). The statute expressly states that the assessment of the fee

"may not exceed the cost of *service* or inspection provided." Utah Code Ann. § 53-7- (d) (emphasis supplied). There is no evidence in the record as to the costs of administering the LPG statutes' regulations or regarding the costs of the services provided by the State. See also V-1 Oil Co., 942 P.2d at 917 (Because fees are not susceptible to exact measurement, and because fee-setting bodies must have "the power to deal creatively" with the various problems they encounter, "[f]ee-setting bodies are entitled to flexibility in their legislative solutions to problems.").

> We also agree with the Sixth Circuit that,

> While non-compliance with established enforcement measures does suggest ulterior motives for a regulatory scheme, particularly where part of the inspection involves collection of the fee, the evidence does not indicate that this [statute] is simply a ruse. Imperfect enforcement does not render an underlying statute unconstitutional.

Interstate Towing, 6 F.3d at 1164 n.10 (citing Hameetman v. City of Chicago, 776 F.2d 636, 641 (7th Cir. 1985) ("The Constitution does not require states to enforce their laws . . . with Prussian thoroughness as the price of being able to enforce them at all.")). "More importantly, since the mandates of the [Utah statutes] promote the public safety and consumer confidence in the regulated services, we must assume that the [statutes] also benefit[] [LPG] companies themselves." Id. at 1164. V-1's allegations that Utah's failure to inspect its out-

29

of-state facilities do not amount to factual disputes that might affect the outcome of this suit. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The district court was correct when it held that V-1 receives many benefits in return for its payments of the statutes' de minimis fees.

Accordingly, the LPG fees had a reasonable relation to the protections and services provided by the State. Finally, because the local interest involved (i.e., the promotion and achievement of public safety and awareness with respect to the handling of hazardous materials) is undisputedly a legitimate and important public interest, see Utah Code Ann. §§ 53-7-305(1)(a), Blue Circle Cement, 27 F.3d at 1511, we hold that any potential burden the de minimis license and certification fee requirements place upon interstate commerce is purely incidental.

## III. CONCLUSION

In sum, we DISMISS the portions of V-1's claims seeking retroactive monetary reimbursement of the assessed certification and license fees and declaratory relief. We DISMISS V-1's claims for injunctive relief. We REMAND for the district court to vacate its judgment as to the aforementioned claims and portions of V-1's suit and dismiss for lack of jurisdiction. As to V-1's

30

claims for prospective injunctive relief against Utah's officers, we AFFIRM the decision of the district court.